SANFORD *v.* UNITED STATES FIDELITY AND GUAR-
ANTY COMPANY.

116　689
e120　631
115　689
Case 1
121　152
·116　689
¹125　318

1. An equitable petition filed by the surety of a tax-collector, in which it is al-
leged that the principal has committed a breach of his bond by a failure to
pay over to the State and county large sums of money which he has collected,
and that the principal is insolvent and is disposing of his personal property
so as to avoid the liens created by the statute thereon, and which prays for
an injunction against the principal to prevent his disposing of his property,
and for the appointment of a receiver to take charge thereof, sets up an equi-
table cause of action, and is sufficient to base on it an amendment in which
it is alleged that the surety, since the filing of the original suit, has paid the
amount of the default of the principal, and that execution has been issued
against the principal and the surety.
2. The cases of *Guilmartin* v. *R. Co.*, 101 *Ga.* 565, and *Tichenor* v. *Paving
Co.*, 116 *Ga.* 303, distinguished.

Argued November 14, — Decided December 11, 1902.

Equitable petition.　Before Judge Henry.　Floyd superior court.
June 5, 1902.

*Dean & Dean, W. J. Neel, Fouché & Fouché,* and *Seaborn &
Barry Wright,* for plaintiff in error.　*Denny & Harris,* contra.

CANDLER, J.　On August 1, 1901, the United States Fidelity
and Guaranty Company filed, in the office of the clerk of the su-
perior court of Floyd county, a petition, the material portion of
which was as follows:　Petitioner, a Maryland corporation doing
business in Georgia as surety on official and other bonds, executed
on named dates certain bonds as surety for Sanford, who, in Octo-
ber, 1898, and again in October, 1900, had been elected tax-col-
lector of Floyd county, these bonds being conditioned upon the
faithful discharge by Sanford of his duties as tax-collector during
the terms of office for which he was elected, two of the bonds be-
ing payable to the Governor of Georgia and his successors in office,
and two to the Board of Commissioners of Roads and Revenues of
Floyd County and their successors in office.　By the terms of
these bonds petitioner was liable as surety for any shortage in San-
ford's accounts in his collections of either State or county taxes.
After the execution, delivery, approval, and acceptance of these
bonds, Sanford defaulted in the payment of the sums due the State
and county in certain large sums, for which sums petitioner was

44

liable as surety, and petitioner was thereby a creditor of Sanford in said sums. Petitioner charged that Sanford had recently conveyed to one Camp, who had knowledge of Sanford's shortage, certain personal property, with intent to defraud and defeat the rights of the State of Georgia and the County of Floyd and of petitioner, and escape their lien upon the property described. Sanford is the owner of a large amount of real and personal property which is subject to be suddenly converted into cash, so as to defeat the rights of petitioner. This real and personal property is to a considerable extent encumbered by mortgages, deeds of trust, bills of sale, and other liens, some of which are superior and some inferior to the rights of petitioner. Much of Sanford's property is subject to be suddenly removed and disposed of, to the injury of petitioner and the destruction of its rights as surety on Sanford's bonds. Sanford is causing his property to be removed beyond the limits of the State since the discovery of the shortage in his accounts, and a considerable amount of his personal property has been placed in the hands of Camp, who either now has the same in his possession or has sold it and applied it to his own use. Under the bonds referred to, petitioner is subrogated to the rights of the State of Georgia and the County of Floyd. Waiving discovery, the petition prays, (1) that Sanford be enjoined from selling, encumbering, or disposing of any of his property, real or personal; (2) that Camp be enjoined from selling or disposing of any of the personal property received by him from Sanford; (3) that a receiver be appointed to take charge of all the property of Sanford, both real and personal, including the crops on the lands, "to reduce the same to cash, and that same may be applied to judgment in favor of petitioner against V. T. Sanford;" (4) for judgment against Sanford for the amount of its debt; (5) that the receiver take charge of and dispose of Sanford's property in the hands of Camp, or, (6) if the same has been converted into money by Camp or is not forthcoming upon the demand of the receiver, that petitioner have judgment against Camp for the value of the property ; and (7) for process.

On August 17, 1901, the judge of Floyd superior court granted a restraining order in accordance with the first two prayers of the petition, and called upon the defendants to show cause before him, on September 2, 1901, why the prayers of the petition should not be granted. On August 29, 1901, the plaintiff presented to the

judge an amendment to its petition, which set out that since the filing of the original petition the plaintiff had paid to the State of Georgia $16,000, and to the County of Floyd $18,000, on account of the bonds before mentioned, whereby Sanford had become indebted to it in the sum of $34,000; that these payments to the State and county were made on account, and by special request the comptroller-general of the State of Georgia and the Board of Commissioners of Roads and Revenues of Floyd County had extended the time to the plaintiff for paying the balance of the shortage until it could have the books checked over and the balance arrived at to their definite satisfaction. The plaintiff by its amendment acknowledged its liability for this balance and promised to pay the amount thereof within a few days. The amendment also alleged that Sanford's indebtedness of $34,000, as therein set out, constituted the plaintiff his creditor in more than three fourths of his entire indebtedness to anybody, and charged that Sanford was hopelessly insolvent. Further facts were set forth as to Sanford's property. The amendment prayed for the appointment of a receiver to take charge of the estate of Sanford, who should be empowered to collect all of its assets and convert them into cash as speedily as practicable, accounting and reporting to the court; for an injunction against the sheriff of Floyd county and his deputies, to restrain them from selling any of Sanford's property under legal process until the parties interested in or claiming such property should come into court by interpleader and have their claims adjudicated; for an order requiring Sanford to turn over to the receiver all of his property, receipts, checks, vouchers, bank-books, and account-books, whether kept by him personally or as tax-collector of Floyd county, which had not already been turned over to the proper authorities; for an order making Camp a party defendant; and for general relief. This amendment was allowed by the judge on August 29, 1901, and was filed in the office of the clerk of Floyd superior court on August 30. It does not appear that any objection was ever made to the allowance of the amendment, or that a motion was made to strike it. On September 2, 1901, the hearing of the case was, by agreement, continued until September 16, at which time the court passed an order substantially granting the prayers of the petition as amended. Neither the defendant nor his counsel were present at the hearing on September 16. On March 27, 1902,

which was during the appearance term to which the original petition was brought, and before the call of the appearance docket, the defendant Sanford filed a demurrer to the petition, on the ground that it did not contain sufficient equity to authorize the grant of the prayers of the petition, and because no cause of action at the time of the filing of the petition was set out, as it appeared that the plaintiff had not then paid the debt for which it stood security, nor any part of it, and it was not then entitled to be subrogated to the rights of the State of Georgia and the County of Floyd. The court overruled the demurrer, and Sanford excepted.

It appears that at the time of filing the original petition the defendant had committed a breach of his duty, and the plaintiff's liability to the State of Georgia and the County of Floyd was beyond question. The commissioners of roads and revenues of Floyd county could, upon the facts stated, have issued execution immediately. The law makes the liability accrue as soon as there is a failure on the part of the tax-collector to pay over to the proper authorities the taxes collected by him. In its petition the plaintiff admitted its then existing liability for the already known default of the defendant. The question for our determination is, was this petition good as an equitable petition to preserve assets? Equity will interfere to take charge of and hold assets charged with the payment of a debt, when there is manifest danger of loss or destruction or material injury to those interested. Civil Code, §4904. As was said in the case _Cohen_ v. _Meyers_, 42 _Ga._ 46, the facts alleged in this case give to the plaintiff "a peculiar equity." In that case the complainants filed a petition charging their debtor, who was alleged to be insolvent, with fraudulently transferring his property to a third person who it was claimed was an accomplice in the fraud, and who was alleged to be using the property and disposing of it to other persons. The petition was demurred to on the ground that the complainants did not allege that they had sued their claims to judgment, and hence it was claimed that the case fell within the rule that a general creditor can not ask the preventive aid of a court of equity before securing a judgment at law. In the case at bar the defendant says that his demurrer should have been sustained, because, upon the date of the filing of the petition, the plaintiff had not paid the amount of the default set out, nor any part of it, and that at that time it was not entitled to be

subrogated to the rights of the State of Georgia and the County of Floyd. The very fact that, through no fault of its own, at the time of filing its petition it did not have the means of protecting itself is a strong reason why it should have equitable relief. The County of Floyd and the State of Georgia were in a position to feel perfectly comfortable over the matter. Each had a sound and solvent security to look to. There was no necessity for either to be in a hurry to issue execution against the defendant or his security. On the other hand, the plaintiff was helpless until this execution was issued, and, pending its issuance, came into court, alleging its willingness and readiness to pay it when issued, and alleged that the defendant, with the aid of an accomplice, was fraudulently disposing of his property, which was liable to be carried beyond the reach of an execution, and invoked the aid of a court of equity to prevent the fraud and irremediable injury to which it was about to become a victim. In the case of *Cohen* v. *Meyers*, supra, the petitioning creditors could not sell the property in question and apply the proceeds of the sale to their debts until those debts had been reduced to judgment. So, in the case at bar, before the security could be subrogated to the rights of the State and county, it was necessary for it to pay the debt due by its principal. In both cases it was alleged that the defendants were taking advantage of the petitioners to fraudulently dispose of their goods and fraudulently place them beyond the reach of the law.

To the same effect as the case cited, see *Smith* v. *McElwain*, 57 *Ga.* 247; *Wachtel* v. *Wilde*, 58 *Ga.* 50; *Crittenden* v. *Coleman*, 70 *Ga.* 293; *Cohen* v. *Morris*, 70 *Ga.* 313; *Albany etc. Co.* v. *Southern Agricultural Works*, 76 *Ga.* 169; *Wolfe* v. *Claflin*, 81 *Ga.* 64; *Martin* v. *Burgwyn*, 88 *Ga.* 78. In the case of *Howell* v. *Cobb* (Tenn.), 2 Coldw. 104, 88 Am. Dec. 591, it was held that a security on a guardian's bond was entitled in equity to be secured against loss before payment of the principal's debt; quoting 2 Story's Eq. Jur. § 849, to the effect that if a surety, after the debt has become due, has any apprehension of loss or injury from the delay of the creditor, he may file a bill to compel the debtor to discharge the debt or other obligation for which the surety is responsible. "This," says the court, "is a well-settled principle in equity jurisprudence." The surety is not required to sit still and await the pleasure of the creditor. If he has reason to believe himself

in jeopardy; if he sees that his principal is disposing of his assets — hiding them, fraudulently concealing them, wasting them or putting them beyond the reach of the law, he has a right to come into a court of equity for relief. "The surety is in equity regarded as a creditor of the principal, and, upon the insolvency of the latter, may retain for his protection, even as against a bona fide purchaser, any assets · in his hands belonging to his principal; otherwise a surety in such a case would be wholly without remedy, when the plainest principles of justice are in his favor. And this relation of debtor and creditor between principal and surety, so as to entitle the latter to avoid a voluntary conveyance by the former, commences at the date of the obligation of suretyship, and not from the time of payment of the debt, though until the latter event he has no technical cause of action against the principal, and consequently no right to be subrogated to the securities held by the creditor." 24 Am. & Eng. Enc. L. (1st ed.) 202–3. "The sureties of a fiduciary, who are compelled to satisfy a liability occasioned by his default, devastavit, or breach of trust, will be subrogated to all the rights and remedies of the cestuis que trustent, creditors, or other beneficiaries, against the fiduciary and those participating in the default, devastavit, or breach of trust. And although the general rule is, that the right to subrogation does not arise until the default of the principal has been made good, yet it seems that if he is insolvent, or there has been fraud, subrogation will be enforced before payment." Ib. 216-217. The following note appears on page 217 et seq. of the authority cited: "The sureties of an insolvent fiduciary, upon a breach of trust by their principal, will in equity be entitled to all the remedies and securities that were in the power of the cestuis que trustent, or creditors, against one who co-operated in the breach of trust, and this even before they have paid to the cestuis que trustent or creditors the amount misapplied by their principal." Citing Bunting *v.* Ricks, 2 Dev. & B. Eq. 130, s. c. 32 Am. Dec. 699; Powell *v.* Jones, 1 Ired. Eq. 337.

We do not think there is any difficulty in reconciling what we now hold with the decisions of this court in the cases of *Guilmartin* v. *Railroad Co.*, 101 *Ga.* 565, and *Tichenor* v. *Paving Co.*, 116 *Ga.* 303. In the case at bar, as we have already had occasion to say, the plaintiff admitted and clearly set forth the completed default of the defendant, its then present and existing liability, and

its readiness and willingness to meet its obligation of suretyship. In the *Guilmartin* and *Tichenor* cases, no default had taken place and no liability had accrued. There was a possibility, and only a possibility, that default would occur and that liability would at some time in the future accrue. In the case at bar, a breach of the bond having already taken place, the plaintiff was,.at the time of filing its petition, answerable to the State and county. The plaintiff clearly alleged these facts, and in addition set up that the defendant, assisted by another, was fraudulently disposing of his property for the purpose of avoiding the obligation of the bonds. In the *Guilmartin* case, a guarantee sought to impound the property of a guarantor before there had been any breach of the contract, guaranteed by the principal. Nothing now held contravenes the doctrine there laid down, to the effect that the mere possibility of a future breach of a contract of guaranty, with a resulting liability against the guarantor, will not authorize the seizure by a court of equity of the effects of the guarantor. Whether or not the original petition was maintainable in so far as it sought to recover a judgment against Sanford for the amount of his shortage, is not germane to this discussion. As an equitable petition to lay hold of and preserve assets it was certainly meritorious,. and furnished ample foundation for the amendment subsequently filed, the sufficiency of the allegations of which to constitute a cause of action is not now disputed. Inasmuch as we hold that there was equity in the original petition, it is unnecessary to discuss the effect of the amendment which was afterwards filed without objection, and the action taken by the court thereon ; nor need we decide whether·the acquiescence of the defendant in the subsequent orders of the court amounted to a waiver of his right to demur.

*Judgment affirmed. All the Justices concurring, except Lumpkin, P. J., absent.*